```
           IN THE UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
                     WESTERN DIVISION


CAMILLA COLLIER, individually as the Wrongful
Death Heir and Beneficiary of Brandon Diaz,
Deceased, as the Administratrix of the Estate
of Brandon Diaz, Deceased                              PLAINTIFF


VS.                         CIVIL ACTION NO: 5:12-cv-133-DCB-MTP


ADAMS COUNTY, MISSISSIPPI; CHARLES R. "CHUCK"
MAYFIELD, JR., Sheriff of Adams County,
Mississippi, in his individual and official
capacities; and UNKNOWN DEPUTY SHERIFFS JOHN
DOES 1-10                                             DEFENDANTS
```

## ORDER DENYING IN PART AND GRANTING IN PART<br>MOTION FOR SUMMARY JUDGMENT

Before the Court is the Defendant's, Charles R. "Chuck" Mayfield, Jr., Motion for Summary Judgment **[docket no. 33]** based on qualified immunity, which is opposed by Plaintiff Camilla Collier. Having carefully considered the motion, the parties' arguments and evidence, applicable statutory and case law, the record in this case, and being otherwise fully advised, the Court finds as follows:

### I. RELEVANT FACTS

On May 6, 2011, the Adams County Sheriff's Department ("ACSD") arrested Brandon Diaz on charges of burglary of a commercial building and resisting arrest. Mot. Summ. J. Ex. B, p. 1-2, ECF No.

1

33-2. On June 22, 2011, he committed suicide while incarcerated.

Diaz had previously been diagnosed with Intermittent Explosive Disorder and Oppositional Defiant Disorder along with Mild Mental Retardation. On June 18, 2007, Diaz underwent a psychiatric consultation through Southwest Mississippi Mental Health Complex ("SMMHC"). According to the report: "[a]t this time there is no evidence of psychosis, and [Diaz] is not suicidal . . . ." Decl. Camilla Collier Ex. A, p. 6, ECF No. 37-1. Diaz returned to SMMHC in May 2009 and received treatment there continually until March 2010.[1] Decl. Camilla Collier Ex. A, p. 1-5. The report from May 1, 2009, indicated that Diaz suffered from "low self esteem, hopelessness, fatigue, lack of concentration, suicidal ideation occasionally, [and] irritab[ility]." Id. The reports from subsequent consultations show that Diaz denied having any further suicidal thoughts.

Diaz was incarcerated, as a pre-trial detainee,[2] from his arrest until his death. Although it is unclear exactly when Diaz ran out of his medication, it is uncontested that Diaz did not have

---

[1] The Plaintiff submitted medical records of psychiatric consultations on June 18, 2007, May 1, 2009, June 4, 2009, September 3, 2009, December 3, 2009, and March 4, 2010. Decl. Camilla Collier Ex. A, p. 1-6, ECF No. 37-1.

[2] The Court recognizes the distinction drawn between the constitutional protections afforded to pre-trial detainees and convicted inmates. See Partridge v. Two Unknown Police Officers of City of Houston, Tex., 791 F.2d 1182, 1186 (5th Cir. 1986). However, this distinction is irrelevant to the Court's analysis.

enough Zoloft for each day of his incarceration and that the Adams County Jail ("ACJ") never refilled his prescription. The Plaintiff brought her son a thirty (30) day supply of his medication on either May 8 or 9 to the ACJ and never delivered any further refills. Pl.'s Mem. Opp'n, p. 12, ECF No. 39. Assuming the ACJ began giving Diaz his medication on May 9 or 10, he went without his medication from June 9 or 10 until June 22, totaling 13 or 14 days.

On the morning of June 22, 2011, Diaz argued with another inmate. As a result, a deputy separated the two inmates by placing them in their separate cells. Several hours later, Brandon Diaz was found dead of an apparent suicide in his cell.

The Adams County Jail and the ACSD policies relating to inmates' prescription medications and suicide prevention came from the standard operating procedures manual maintained by the ACSD.[3] Mot. Summ. J. Ex. D, p. 10, ECF No. 33-4.

The prescription medication policy begins: "it is the jailer's responsibility to ensure that [prescription] medicine(s) are dispensed exactly as prescribed. Deviations in administering medicines will not be tolerated." Notice Supplemental Exs. Supp. Pl.'s Supplemental Mem. Opp'n ("Pl.'s Supp. Exs.") Ex. A1, p. 1, ECF No. 54-2. According to the policy, the ACJ maintained a

---

[3] The policies have since changed because the Sheriff's Department has outsourced its medical services. Mot. Summ. J. Ex. D, p. 10, ECF No. 33-4.

medication log sheet for each inmate on prescription medication. The written policy was supplemented by an unwritten policy for refilling medications prescribed by a doctor other than the county physician. If medication had originally been brought in by family members, then the ACJ would let the family refill it. Pl.'s Supp. Exs. Ex. A, p. 5, ECF No. 54-1 ("Q. And what happens when an inmate runs out of medicine? A. Okay. It depends. If we had ordered the medication, [our pharmacy] would have automatically shipped it. Had the medicine been brought in by the family members then we would have waited for them to bring it."). When an inmate's prescription ran out, the jailer dispensing medication would inform the jail administrator or the assistant jail administrator. After the jail administrator was notified that

> an inmate was out of medication that was prescribed by an outside physician, [the jail administrator] would first notify the inmate's family that the inmate was out of that medication and request that they follow up with the inmate's physician to determine whether or not the medication needed to be refilled. The family would then bring the medication to the [ACJ] where the Jail nurse would review the medication and medication instructions to make certain that the medication was what it purported to be and that the prescription was valid. The medication would then be administered.

Def.'s Rebuttal Ex. M, p. 3, ECF No. 42-2. No one informed the jail administrators that Diaz was out of Zoloft. Pl.'s Supp. Exs. Ex. A, p. 6 ("Q. Do you have any recollection as to whether any jailer or deputy notified you that Brandon Diaz had run out of medication? A. I don't remember getting a sick call slip on that . . . . And if it

was not in the record, then it didn't happen.").

The suicide prevention policy begins: "jail officers are responsible for preventing suicides," and "[c]onfinement in a jail and the circumstances that led to it can cause feelings of desperation in inmates, prompting some to seriously consider suicide." Pl.'s Supp. Exs. Ex. A1, p. 3, ECF No. 54-2. The policy identifies three suicidal types: (1) an inmate facing a crisis situation, (2) an inmate in a serious depression, and (3) manipulative and impulsive inmates. In addition, it lists behaviors which jailers should look out for to identify suicide risks:

   a. Anyone obviously under the influence of either drugs or alcohol.
   b. Anyone returning to the jail who has demonstrated suicidal tendencies during previous periods of incarceration.
   c. People who seem to be extremely withdrawn or distant.
   d. Anyone who makes comments such as: "What is the use of living anymore?" or "Nobody cares about me anyway!"
   e. Persons who seem overly-anxious.

Id. These behaviors are identified at the intake stage through a screening questionnaire, and any concerns are to be immediately reported to a supervisor. Id.; Pl.'s Supp. Exs. Ex. B, p. 3-4, ECF No. 54-3. These procedures were also supplemented by unwritten policies. "At intake . . . jailers consider a number of items . . . . One item considered is whether or not an inmate has expressed suicidal tendencies during a previous incarceration . . . Jailers . . . constantly assess inmates based on [their] interaction with

5

that particular inmate, sick calls or grievances submitted by the inmate, and the advice of medical providers." Def.'s Rebuttal Ex. L, p. 2.

## II. STANDARD

### A. Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law. An issue is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the non-moving party." Ginsberg 1985 Real Estate P'ship v. Cadle Co., 39 F.3d 528, 531 (5th Cir. 1994) (citations omitted). The moving party bears the initial responsibility of apprising the district court of the basis for its motion and the parts of the record which indicate the absence of a genuine issue of material fact. Celotex Corp. V. Catrett, 477 U.S. 317, 323 (1986).

"Once the moving party presents the district court with a properly supported summary judgment motion, the burden shifts to the non-moving party to show that summary judgment is inappropriate." Morris v. Covan World Wide Moving, Inc., 144 F.3d 377, 380 (5th Cir. 1998). "The evidence of the non-movant is to be

believed, and all justifiable inferences are to be drawn in his favor." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986). But the nonmovant must meet his burden with more than metaphysical doubt, conclusory allegations, unsubstantiated assertions, or a mere scintilla of evidence. <u>Little v. Liquid Air Corp.</u>, 37 F.3d 1069, 1075 (5th Cir. 1994). A party asserting a fact is "genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1)(A).

Summary judgment must be rendered when the nonmovant "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex</u>, 477 U.S. at 322.

### B. Qualified Immunity

"Qualified immunity balances two important interests–the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." <u>Pearson v. Callahan</u>, 555 U.S. 223, 231 (2009). "A qualified immunity defense alters the usual summary judgment burden of proof. Once an official pleads the defense, . . . [t]he

plaintiff bears the burden of negating the qualified immunity, but all inferences are drawn in his favor." Brown v. Callahan, 623 F.3d 249, 253 (5th Cir. 2010). In assessing a claim of qualified immunity, courts apply the two pronged analysis established in Saucier v. Katz, 533 U.S. 194 (2001), but the court may address the prongs in any order, Pearson, 555 U.S. at 225.

One prong asks "whether Plaintiff's allegations establish a constitutional violation." Hope v. Pelzer, 536 U.S. 730 (2002). The second prong asks "whether the right was clearly established." Saucier, 533 U.S. at 201. "[T]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987).

Under the facts presented, Sheriff Mayfield may be held liable only on a theory of supervisory liability. There are two theories of supervisory liability: (1) failure to train or supervise the officers involved, Thompson v. Upshur Cnty., Tex., 245 F.3d 447, 459 (5th Cir. 2001), and (2) implementation of "a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of the constitutional violation," Thompkins v. Belt, 828 F.2d 298, 304 (5th Cir. 1987) (internal quotations omitted).

## III. ANALYSIS

A. State Law Claims

The Plaintiff has voluntarily dismissed several of the counts of her claim against the Defendant in his individual capacity, including her state law negligence claim and her unlawful arrest claim. Pl.'s Mem. Opp'n, p. 2 n.2, ECF No. 39; Id., at p. 13 n.17. Collier, however, maintains her state law wrongful death claim against Sheriff Mayfield in his individual capacity. Sheriff Mayfield contends this claim is subject to the Mississippi Tort Claims Act and should be dismissed. Def.'s Rebuttal, p. 1 n.1, ECF No. 42.

The Court finds that neither party has adequately addressed this issue in its briefing. See Pl.'s Mem. Opp'n, p. 2 n.3 ("The defendants did not address plaintiff's wrongful death claim. Therefore, the plaintiff will not address that claim."). Therefore, the Court denies this motion without prejudice so far as it concerns the Plaintiff's wrongful death claim.

B. Failure to Train

All jailers at the ACJ were required to complete training at a state mandated "jail certification school." Dep. Charles "Chuck" Mayfield, Jr., p. 12, ECF No. 33-4. They received no further formal training. See Dep. Joseph West, p. 3, ECF No. 54-3. If the jailers were only required to complete a state mandated training program, then the plaintiff must prove the state training was inadequate.

9

See Benavides v. Cnty. of Wilson, 955 F.2d 968, 973 (5th Cir. 1992). Also, mere proof that the injury would not have occurred if the officer had received better or additional training cannot, without more, support liability. Roberts v. City of Shreveport, 397 F.3d 297 (5th Cir. 2005). Here, Collier has not provided any evidence that the state training is inadequate, and the plaintiff is only attempting to argue that the injury would not have occurred had the jailers received additional training. Therefore, Sheriff Mayfield cannot be held liable on a failure to train theory.

## C. Deficient Policy

### 1. Inadequate Medical Treatment

It is clearly established law that prisoners are entitled to adequate medical treatment, and jailers violate this right when they are deliberately indifferent to a prisoner's serious medical needs. Estelle v. Gamble, 429 U.S. 97, 103-05 (1976). The standard is the same whether applied to "prison doctors in their response to the prisoner's needs or [to] prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." Gamble, 429 U.S. at 104-05. The Third Circuit has established a serious medical need as one which has been diagnosed by a physician as requiring medical treatment. Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro, 834 F.2d 326, 347 (3rd Cir. 1987). The evidence shows that Diaz was

10

prescribed Zoloft; therefore this is a serious medical need. Viewing the evidence in the light most favorable to the nonmovant, the Court finds for the purposes of this motion that the evidence is likely to show Diaz's prescription ran out roughly two weeks before his death.

Based on the nature of this case, the Court will only look to the second prong of Saucier. See Morgan v. Swanson 659 F.3d 359, 384-85 (5th Cir. 2011) (discussing the Supreme Court's ongoing retreat from Saucier's mandatory order of battle and active discouragement of district courts from "unnecessarily deciding the merits of a constitutional issue"). In Thompkins, the court ruled that an official could only be held liable through a deficient policy if the official knew the jail's policy was so deficient that it exposed prisoners to a substantial risk of significantly unmet serious medical needs and failed to correct it. Thompkins, 828 F.2d at 304. The existence of a constitutionally deficient policy cannot be inferred from a single wrongful act. Id.

Collier has put on no evidence that the policy required a written sick call slip, whereas Sheriff Mayfield has personally sworn that the policy accepted oral requests. "[T]he nonmoving party may not rest upon the mere allegations . . . in its pleadings, but must instead set forth *specific facts* showing that there is a genuine issue for trial." Sec. & Exch. Comm'n v. Recile, 10 F.3d 1093, 1097 (5th Cir. 1993). Therefore, based on the facts

11

on the record, the Court finds that the policy is not facially unconstitutional. Further, "a single incident of unconstitutional activity is not sufficient to impose liability . . . unless proof of the incident includes proof that it was caused by an existing, unconstitutional . . . policy. . . ." City of Oklahoma City v. Tuttle, 471 U.S. 808, 824 (1985) (plurality opinion). Collier has only alluded in her briefing to prior complaints filed against Sheriff Mayfield but has not produced any evidence of their content or their similarity to Diaz's inadequate medical care. Therefore, Sheriff Mayfield is entitled to qualified immunity on this claim.

## 2. Failure to Protect

Collier has pled that Sheriff Mayfield failed to protect her son from himself, leading to his suicide, and failed to protect him from others, leading to his rape. To establish a failure to protect claim, a prisoner must show that he is incarcerated under conditions posing a substantial risk of serious harm and that prison officials were deliberately indifferent to his need for protection. Neals v. Norwood, 59 F.3d 530, 533 (5th Cir. 1995) (citing Farmer v. Brennan, 511 U.S. 825, 834 (1994)). To act with deliberate indifference, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837; see also Neals, 59 F.3d at 533. "The failure to

protect[ inmates] from their known suicidal impulses is actionable under § 1983. . . ." Rhyne v. Henderson Cnty., 973 F.2d 386, 391 (5th Cir. 1992). Although actionable, courts have previously recognized the fundamental dilemma of suicide prevention. "Suicide is inherently difficult for anyone to predict, particularly in the depressing prison setting." Domino v. Tex. Dep't of Crim. Justice, 239 F.3d 752, 756 (5th Cir. 2001); see also Evans v. City of Marlin, Tex., 986 F.2d 104, 107 (5th Cir. 1992) (finding that because police personnel lack the expertise of medical professionals with psychiatric training they are not required to detect suicidal tendencies with perfect accuracy).

Here, Diaz indicated to his jailers that he was not suicidal at the time of his incarceration and the history of psychiatric evaluations at SMMHC, although unknown to the jailers, confirmed that Diaz's treatment was effective and that he had not been suicidal. It follows that there was nothing for the jailers to note about Diaz which would have alerted them to the potential of his suicide at intake. It further follows that Diaz would not have demonstrated any signs of suicidal thoughts before he ran out of his medication.[4] Thus the only time the jailers could have or

---

[4] The declaration of an inmate housed with Diaz supports this analysis of Diaz's behavior. Duck stated Diaz was "interactive with [him] and other inmates [and] . . . appeared happy and regularly talked with [him] and other inmates in the cell block" from the beginning of his incarceration until he ran out of medication. Decl. Willie Duck, p. 2, ECF No. 38.

should have seen a self-destructive change in Diaz's behavior is in the two weeks between his last dose of medication and his death. An inmate housed in the same cell block as Diaz, Willie Duck, stated Diaz "became withdrawn and stopped talking to [him] and other inmates . . . [and] appeared to be sad rather than happy" after he ran out of his medication. Duck further stated "[t]he jailers could see" Diaz's change in behavior. Decl. Willie Duck, p. 2, ECF No. 38.

However, the test for deliberate indifference is subjective, requiring the "conscious[] disregard of a substantial risk of serious harm." Farmer, 511 U.S. at 838-39. The knowledge of such a risk may be inferred from circumstantial evidence where the risk is obvious. Id., at 842. Collier implies in her briefing that the jail should have been aware Diaz was suicidal at intake because he had been previously suicidal. The jail's policy of continuing evaluation based on multiple factors, of which previous known suicidal behavior is just one, does not violate the Constitution because it is not deliberately indifferent. The jail evaluates suicide risk, but it is not possible to identify and prevent every suicide risk.

Even accepting that the change in Diaz's behavior did occur and that the jailers were aware of it, Collier has not provided any evidence this behavior demonstrates a substantial risk of suicide. Not every human moment of despondency means an individual is

14

planning to take his life. A verbal argument with another inmate does not, in itself, indicate feelings of suicide. Therefore, Sheriff Mayfield is entitled to judgment as a matter of law. The jail's suicide prevention policy was not deliberately indifferent to Diaz's need for protection from himself.

Prior to his death, Diaz wrote his mother a letter stating he was raped in jail. Decl. Camilla Collier, p. 2, ECF No. 37. Having discovered the letter in a bag of dirty laundry she was taking home to wash, Collier showed it to three deputies at the jail. The deputies denied that Diaz could have been raped in jail. Pl.'s Supp. Exs. Ex. D, p. 21, ECF No. 54-7; Pl.'s Supp. Exs. Ex. A1, p. 17, ECF No. 54-2.

Collier has produced little evidence beyond mere allegations that Diaz was raped in the ACJ. Further, Collier has put on no evidence that any policy implemented by Sheriff Mayfield was deliberately indifferent to a substantial risk of rape. Therefore, the Court finds that Sheriff Mayfield is entitled to judgment as a matter of law on this issue.

## IV. Order

IT IS HEREBY ORDERED that defendant Charles "Chuck" Mayfield, Jr.'s Motion for Summary Judgment (docket entry 33) is GRANTED in part and DENIED in part.

FURTHER ORDERED that the motion is DENIED as to the

Plaintiff's wrongful death claim.

FURTHER ORDERED that all of the Plaintiff's other state law claims are voluntarily dismissed.

FURTHER ORDERED that the motion is GRANTED as to the inadequate medical care claim.

FURTHER ORDERED that the motion is GRANTED as to the Plaintiff's failure to protect claim.

So ORDERED, this the 29th day of September 2014.

                                         /s/ David Bramlette
                                        UNITED STATES DISTRICT JUDGE